1
2
3
4                        UNITED STATES DISTRICT COURT
5                       NORTHERN DISTRICT OF CALIFORNIA
6
7    JONATHAN MICAH GARDNER,
                                                Case No.  15-cv-04695-SI
              Petitioner,
8
         v.                                     ORDER GRANTING PETITION FOR
9                                               WRIT OF HABEAS CORPUS
10   KIM HOLLAND,
              Respondent.
11
12
13                              INTRODUCTION
14       Jonathan Micah Gardner filed this *pro se* action for a writ of habeas corpus under 28
15   U.S.C. § 2254.  The court issued an order to show cause why the writ should not be granted.
16   Respondent has filed an answer and Gardner has filed a traverse.  For the reasons below, the
17   petition will be GRANTED on the Confrontation Clause claim.
18
19                               BACKGROUND
20       Following a jury trial in Alameda County Superior Court, Jonathan Micah Gardner was
21   convicted of forcible oral copulation and rape.  On August 29, 2012, he was sentenced to 18 years
22   consecutive to 25 years to life in prison.  Gardner appealed to the California Court of Appeal and
23   his conviction was affirmed in 2015.  The California Supreme Court denied his petition for review
24   in 2015.
25       The California Court of Appeal described the facts of this case as follows:
26       In September 2008, Oakland Police Officer Herbert Webber became involved in
         the investigation of an alleged forcible rape against Jane Doe in January 2002.  The
27       case was assigned to Webber when defendant's DNA came up as a cold case hit for
         DNA collected from the condom at the scene of the alleged rape.  Webber
28       contacted Jane Doe and took a recorded statement from her in January 2010.

Webber showed Jane Doe a photo lineup with six photographs and she identified defendant as the person who raped her.  Webber also contacted defendant, who had been placed under arrest.  In May 2011, defendant was charged in this matter.

On April 30, 2012, at the conclusion of trial, the jury was unable to reach a verdict, and the court declared a mistrial.

The case was retried in July 2012.

*Jane Doe's Testimony*

On the night of January 15, 2002, Jane Doe left home to meet two friends at a pizzeria on the corner of 35th Avenue and International Boulevard in Oakland.  She was 15 years old.  Around her neck she was wearing a Mickey Mouse pendant on a gold chain.  She planned to take a bus with her friends to Jack London Square to see a movie.  Jane Doe was running late because she had to wait until her mother was asleep so she could leave without her mother knowing.

By the time Jane Doe arrived, her friends were not there.  She waited a few minutes, decided they must have left already, and got change to use the pay phone in front of the pizzeria.  She called her brother's friend Marcus, who agreed to give her a ride home from the pizzeria.  He estimated he would be there in about 10 to 15 minutes.

Defendant, who had been released from jail only the day before, asked Jane Doe for her phone number when she went into the pizzeria for change.  She "brushed him off" and ignored him because she did not know him.

After calling Marcus, Jane Doe went back inside the pizzeria to wait. After 15 or 20 minutes, she called Marcus again from the pay phone; he confirmed he was on the way.  While she was on the phone, defendant asked her more than once for the time.  Jane Doe was annoyed with him for interrupting her conversation.  She hung up the phone, intending to go back into the pizzeria to wait.

As soon as the call was over, defendant grabbed her and forced her to walk along the side of the pizzeria up 35th Avenue.  He told her not to run and not to make any noise.  She felt something cold and hard pressed up against her side; she thought it was a gun.  Defendant told her she was going to be his "bitch" and make him lots of money.  Jane Doe tried to get away, but he pulled her back by her braids.

Defendant took her down an alleyway behind an apartment building.  It was dark and she was afraid.  A woman came to an upstairs window and looked out.  Defendant told Jane Doe not to say anything, and because she was scared, she was quiet until the woman turned out the light and left the window.

Defendant gave Jane Doe a condom and told her to "give him head."  When she refused, he got aggressive and loud.  He picked up a board and threatened to "beat [her] ass with it."  He demanded oral sex, but Jane Doe refused repeatedly and threw the condom on the ground.  Defendant then pulled her hair, bringing Jane Doe to her knees.  Jane Doe continued to protest, but defendant forced her to perform oral sex on him.  This continued for a few minutes.  Defendant did not ejaculate.

Defendant then told Jane Doe to take off her pants.  She refused.  Defendant was "extremely upset" and hit her on the left side of her face, but she still refused to take off her pants.  He slapped her at least twice, then started pulling her pants

down.  She resisted but defendant eventually overpowered her.  She felt defendant's weight on her from behind as she was pushed up against some tires that were in the yard.  He grabbed her by the throat and choked her, breaking the chain and pendant she was wearing.  Defendant inserted his penis into her vagina against her will. While doing this, he also bit Jane Doe on her face or neck.

Jane Doe knew defendant wore a condom.  She "begged" him to wear one.  Jane Doe thought he ejaculated because "he made a noise, and then he pulled it out." After he raped her, Jane Doe realized she no longer had the Mickey Mouse pendant or chain and did not know where they were.

At trial, Jane Doe identified the broken gold chain and the broken Mickey Mouse pendant she had been wearing that night.  An evidence technician with the Oakland Police Department found the broken pendant when she was processing the crime scene.  The evidence technician also found a used condom and a condom wrapper at the scene.

After defendant ejaculated, he pulled his pants up and told Jane Doe to pull hers up, too.  He told Jane Doe that "for [her] age, [she] should have been better," but he was still going to make her his prostitute and make money.  With his arms around her and holding her tightly, defendant walked Jane Doe back to 35th Avenue and then north on 35th to a bus stop.  Before getting on the bus, defendant warned her not to say anything or ask anyone for help.

While they were on the bus, defendant told Jane Doe they were going to see a friend of his who would pay $500 for a "date" with her, which she understood to mean that the friend would pay to have sex with her.  She told defendant she did not want to do that.  When they got off the bus, they went into a liquor store because defendant wanted Jane Doe to buy him a beer.  She told him she was not old enough to buy beer.  While defendant waited at the front of the store, Jane Doe got the beer for defendant and a soda for herself; defendant paid for the drinks with her money.  She did not say anything to the clerk working in the store because she did not believe he would help her.

As they left the store, Jane Doe saw a police officer sitting in a police car in the parking lot.  Jane Doe was afraid and did not think she could get the officer's attention.

They left the store and walked for several blocks, turning several times.  It seemed to Jane Doe that defendant was lost.  Defendant kept talking about the $500 "date." After about 20 to 30 minutes, they stopped at a house but defendant did not knock on the door.  After sitting on the curb for 5 or 10 minutes, Jane Doe started crying. Defendant asked what was wrong with her, which she thought "was a pretty stupid question."  Jane Doe told him she "didn't want to be there;" she "didn't want to date;" she "just wanted to go home."

Defendant was "silent for a moment," just sitting there, and then said, "okay, you can leave."  Jane Doe was confused and scared to move.  Defendant told her to "walk across the street and not turn around."  Jane Doe was afraid he was going to shoot her.  She started walking across the street, then started running.  She looked back and defendant was running after her.  She ran to the nearest house that had a porch light on, banged on the door and asked the occupants to call 911.

United States District Court
Northern District of California

1

2

*Law Enforcement and Medical Response*

Jane Doe told the responding police officer what had happened.  The officer took her back to the location where she was raped.  The evidence technician who processed the crime scene spoke with Jane Doe and noticed minor swelling over her left eyebrow.

The police took Jane Doe to the hospital for a rape examination.  She was uncomfortable because she had never been to the doctor without her mother.  After the examination, the police took her home.  It was after midnight.  Jane Doe never told her mother or anyone else what happened that night.  She did not want her mother to be mad at her for going out without permission, and she blamed herself and felt ashamed.

Jane Doe stopped following up with the police because they told her they could not talk to her about the case without talking to her mother.  Jane Doe did not want her mother to know what had happened, so she told the police she did not want to pursue it.  In the eight years that followed the incident, Jane Doe did not talk to anyone about the events of that night other than her therapist and her fiancé until she gave her statement to Officer Webber in 2010.

The physician's assistant who examined Jane Doe at the hospital found injuries to her genital area that were consistent with sexual assault.  He could not determine with "scientific certainty" that they were caused by a sexual assault, but it was his opinion that such injuries were much more common in a sexual assault than in consensual sex.  The injuries were consistent with Jane Doe's description of what had happened.

*Defendant's Prior Sexual Offenses*

Aaliyah Doe testified pursuant to Evidence Code section 1108 [footnote 2 omitted] about sexual offenses that defendant committed in February 2002, one month after the alleged rape of Jane Doe.  Aaliyah Doe met defendant on a telephone party chat line.  She told him she was 15, but she was only 13 at the time.  They arranged to meet, and then went back to the apartment that she lived in with her family.  Aaliyah Doe was taking care of her young cousin that day; her aunt and grandmother were not at home.  She did not want the boy to know she had company, which was not allowed, so she invited defendant into her bedroom.  Aaliyah Doe testified that she had no intention of being with defendant sexually.  She testified that, after some small talk, defendant touched her breast and pushed her down on the bed.  She told him no and resisted him, trying to push him off of her.  Defendant raped her twice, using condoms he carried in his back pocket.  He finally left the apartment with two bottles of her grandmother's alcohol when someone making a delivery came to the door.  Aaliyah Doe was afraid of being punished when her grandmother found the liquor bottles missing.  She called 911 and told the police that defendant had forced his way into the apartment, tried to rape her, and stole some things, but that she just wanted to make a report; she did not want the police to come.  She acknowledged that what she initially told the police when she called 911 was not true.

After Aaliyah Doe testified, the trial judge read a stipulation of counsel to the jury: "Back in the year 2002, based upon the allegations made by Aaliyah Doe, the defendant was charged with two counts of forcible rape and one count of committing a lewd and lascivious act with a child under the age of 14.  He was formally charged.  The case went to trial.  The result of that trial was that the jury

found the defendant guilty of the charge of committing a lewd and lascivious act on a child under the age of 14. The jury found him not guilty of one of the counts of forcible rape. And on the other count of forcible rape, the jury was unable to reach a verdict." The trial judge told the jury the elements of the crime of committing a lewd or lascivious act with a child under the age of 14.

*Defendant's Testimony*

Defendant testified at trial that he picked Jane Doe up in front of the pizzeria. She agreed to have sex with him for $40, and took him to the backyard of the apartment building. Defendant supplied the condom, Jane Doe pulled down her pants, and defendant had vaginal intercourse with her from behind. There was no oral sex. When they were done, defendant claimed not to have the $40 he owed her. Jane Doe was angry about not being paid, so defendant said a neighbor of his might pay her $40 or $50 for sex. Jane Doe rode the bus with him to find the neighbor. The broken pendant left at the scene was the result of Jane Doe angrily swinging her jacket and "getting loud." At that time, a woman came to the window of the apartment building. Jane Doe and defendant left because they were trespassing and afraid the woman in the window would call the police.

California Court of Appeal opinion in *People v. Gardner*, No. A136453 (Cal. Ct. App. Feb. 2, 2015) ("Cal. Ct. App. Opinion") at 2-7 (footnote omitted).

In his federal petition for writ of habeas corpus, Gardner contends that the trial court's exclusion of evidence of Jane Doe's multiple arrests and convictions for prostitution between the years 2004 and 2006 violated his Sixth Amendment right to confront a witness and Fourteenth Amendment right to due process. He also asserts that he did not receive the effective assistance of counsel guaranteed by the Sixth Amendment because his attorney did not object to the prosecutor's purported misstatement of critical evidence during rebuttal closing argument. Gardner finally asserts that the cumulative effect of these two errors denied him a fair trial.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

United States District Court
Northern District of California

1

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

United States District Court
Northern District of California

**DISCUSSION**

A.     Confrontation Clause Claim

        Gardner claims that the exclusion of evidence of Jane Doe's arrests and convictions for prostitution violated his rights under the Confrontation Clause.  The underlying facts were that, "[s]tarting in 2004, after Jane Doe turned 18, until October 2006, she worked as a prostitute.  She was arrested 15 times for prostitution in California, Nevada, Arizona, Washington, New York, and Washington, D.C., and suffered six misdemeanor convictions.  This included an arrest in 2005 that resulted in a conviction in 2006 for prostitution in Oakland, not far from where Jane Doe encountered defendant on January 15, 2002."  Cal. Ct. App. Opinion at 9-10 (footnote omitted).  To summarize the chronology:  Jane Doe reported the rape in 2002; Jane Doe's prostitution activities and convictions occurred in 2004-2006; Gardner's DNA was matched in 2008 to semen found at the scene of the reported rape; and the trial was held in 2012.  At an *in limine* hearing, the trial court ruled that the prostitution evidence and any cross-examination of Jane Doe about her prostitution activities and convictions would not be admissible.

        The California Court of Appeal determined that the trial court did not err under California law or the Confrontation Clause in excluding the evidence.  A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988).  The California Court of Appeal's determination that the evidence was properly admitted under state law is binding on this court on federal habeas review.  It will aid the understanding of this court's Confrontation Clause analysis to first describe how the state courts resolved the state law evidence issues and how that impacted the state appellate court's resolution of the Confrontation Clause claim.

1        1.      The State Courts' Evidentiary Rulings

2        The trial court ruled that, under California Evidence Code section 1103(c)(1), the evidence

3   of Jane Doe's prostitution was inadmissible on the issue of her consent.[1]   Gardner did not

4   challenge that ruling on appeal.  Cal. Ct. App. Opinion at 8.

5        The more difficult question, and the one that gives rise to the Confrontation Clause claim,

6   was whether the evidence of the prostitution convictions was admissible to impeach Jane Doe's

7   credibility.

8        Under California law, "'the rule barring evidence of a victim's sexual conduct with persons

9   other than the defendant does not 'make inadmissible any evidence offered to attack the credibility

10  of the complaining witness as provided'" in California Evidence Code section 782.  Cal. Ct. App.

11  Opinion at 8 (quoting Cal. Evid. Code § 1103(c)(5)).  Section 782(a)(4) requires the trial court to

12  make two determinations. First, the trial court must determine that the evidence "regarding the

13  sexual conduct of the complaining witness is relevant pursuant to [Evidence Code] Section 780,"

14  which pertains to witness credibility and allows consideration of a witness's "character for honesty

15  or veracity or their opposites." Cal. Evid. Code § 780(e).  Second, the trial court must determine

16  that the evidence is not inadmissible under California Evidence Code section 352, which allows

17  exclusion of evidence where "its probative value is substantially outweighed by the probability

18  that its admission will (a) necessitate undue consumption of time or (b) create substantial danger

19  of undue prejudice, of confusing the issues, or of misleading the jury."  If the evidence clears those

20  two hurdles, the trial "court may make an order stating what evidence may be introduced by the

21  defendant, and the nature of the questions to be permitted." Cal. Evid. Code § 782(a)(4).

22        Here, the trial court noted that prostitution was a crime of moral turpitude and did relate to

23  honesty, but was not as strongly related to honesty as some other crimes, such as theft and forgery.

24  RT 127-128.  The trial court concluded that the evidence was not "'particularly strong as it relates

25  to the character trait of honesty or veracity, and particularly when you consider that its purpose

26

27        [1] Generally, in a prosecution for rape, "opinion evidence, reputation evidence, and
    evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence,
28  is not admissible by the defendant in order to prove consent by the complaining witness."  Cal.
    Evid. Code § 1103(c)(1).

United States District Court
Northern District of California

1    would be to attack her credibility today, when she describes something that happened 10 years

2    ago.'" Cal. Ct. App. Opinion at 10.  The trial court pointed out that Jane Doe's basic allegations

3    had not changed between her initial report of the incident in 2002 and the trial in 2012, that her

4    credibility in 2004 and 2006 was not at issue, and that there was no evidence that she had done

5    anything involving moral turpitude in the six years before the trial.  Ultimately, the trial court

6    concluded that exclusion was proper under California Evidence Code section 352 because the risk

7    that the jury would consider the evidence for an improper purpose weighed against its admission.

8    *Id.* at 11.[2]

9        The California Court of Appeal viewed "this to be a close case, but conclude[d] that the

10   trial court acted within its discretion in excluding the evidence" under the California Evidence

11   Code.  *Id.* at 11.

12       Next, the California Court of Appeal addressed the Confrontation Clause claim.  This was

13   the entirety of the state appellate court's constitutional analysis:

> Because on this record we cannot conclude that the trial court abused its discretion
> in excluding the evidence, we necessarily find no violation of defendant's
> constitutional rights to confrontation and due process. (*See People v. Cornwell*
> (2005) 37 Cal.4th 50, 82 ["a state court's application of ordinary rules of
> evidence—including the rule stated in Evidence Code section 352—generally does
> not infringe upon" the right to offer a defense], overruled on another ground in
> *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; accord, *People v. Fuiava*
> (2012) 53 Cal.4th 622, 665–666.)

Cal. Ct. App. Opinion at 16.

---

   [2] The subjects of Jane Doe's prostitution on other occasions and her criminal record came
up in other, minor, ways at trial.

       The trial court allowed the defense to ask Jane Doe if she was engaged in prostitution on
the night she reported the rape in 2002, but ruled that such inquiry would not open the door to
admission of evidence about her later activities as a prostitute.  RT 135-136.

       Jane Doe had warrants outstanding for failure to appear in a criminal case in San
Bernardino when she was contacted by the police after the DNA match was made.  The trial court
allowed the defense to ask Jane Doe about outstanding warrants against her when she spoke to the
police in 2010, but did not allow questions as to the sort of case underlying the warrants, other
than that it was a misdemeanor.  RT 131-132.

       Gardner testified that Jane Doe was engaged in prostitution.  Also, during his testimony, he
made a fleeting reference to her record, but the trial court cut him off.

United States District Court
Northern District of California

2.      The California Court of Appeal's Decision
        Was Contrary To Clearly Established Federal Law

A state court's "mistakes in reasoning or in predicate decisions" such as using the wrong legal rule or framework "constitute error under the 'contrary to' prong of § 2254(d)(1)." *Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008) (en banc); *see Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (decision by a state court is "contrary to" Supreme Court's clearly established law if it "applies a rule that contradicts the governing law set forth in [Supreme Court's] cases"); *see, e.g., id.* (if, for example, "a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different'"); *Frantz*, 533 F.3d at 734 (review of *Faretta* violation for harmlessness was contrary to Supreme Court holding that a *Faretta* violation is structural error).

The California Court of Appeal treated the Confrontation Clause analysis as coextensive with the state law evidence question -- determining that, because the trial court did not abuse its discretion in excluding the evidence under state evidence rules, "we *necessarily* find no violation of defendant's constitutional rights to confrontation and due process" -- and that was contrary to clearly established law from the U.S. Supreme Court.  It is true that the Supreme Court has said that compliance with state law rules of evidence *generally* does not offend the Confrontation Clause, but the Supreme Court has not said that compliance with state law rules of evidence *necessarily* means that the Confrontation Clause right has been satisfied.  *See generally Crawford v. Washington*, 541 U.S. 36, 50-51 (2004) (hearsay rules and Confrontation Clause have different focus; "[l]eaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices"); *Williams v. Illinois*, 132 S. Ct. 2221, 2272 (2012) (Kagan, J., dissenting) (*Crawford* "made clear that the Confrontation Clause's protections are not coterminous with rules of evidence").  Although the analysis of out-of-court statements under *Crawford* provides the most obvious

10

United States District Court
Northern District of California

illustration that state evidence rules and the Confrontation Clause do not have an identical reach, differences also exist for restrictions on cross-examination.  For example, in *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986), the Supreme Court determined that a Confrontation Clause violation had occurred when Rule 403 (i.e., a provision similar to California Evidence Code section 352) was invoked to bar all cross-examination about an agreement the witness had with the prosecutor.  The defense in *Van Arsdall* had wanted to impeach the witness with the evidence to show the witness' motive and bias.  Had the state court's application of the state evidence rule (i.e., Rule 403) fully resolved the Confrontation Clause claim, *Van Arsdall* would have come out differently.  *Accord Slovik v. Yates*, 556 F.3d 747, 753 & n.6 (9th Cir. 2009) (Confrontation Clause violation occurred when defense was not allowed to ask witness about being on probation; "California evidentiary law is irrelevant to the determination of Slovik's constitutional rights"); *Childers v. Floyd*, 736 F.3d 1331, 1335-36 (11th Cir. 2013) (en banc) (Wilson, J., dissenting) (defendant's "Sixth Amendment rights could be violated even if his cross-examination of Willie Junior was properly limited under Rule 403. Our per curiam opinion seems to suggest that Rule 403 and the Sixth Amendment right of confrontation go hand in hand with one another—if there is no Rule 403 violation, then it follows that there is no Sixth Amendment constitutional violation either. I cannot subscribe to that view.")

Even when a state evidence rule permits the exclusion of the evidence, a court conducting a Confrontation Clause analysis must go further and determine that the restriction on the defendant's right to confront the witness is not "arbitrary or disproportionate" to the purposes the state evidence rule was designed to serve.  *See Michigan v. Lucas*, 500 U.S. 145, 151 (1991).[3]  A trial judge's "'wide latitude'" to limit cross-examination "'based on concerns about, among other

---

[3] In *Michigan v. Lucas*, the Supreme Court held that the Sixth Amendment did not categorically prohibit enforcement of a rule requiring a rape defendant to provide pretrial notice if he wished to introduce evidence of his prior sexual relationship with the complaining witness.  *See Michigan v. Lucas*, 500 U.S. 145 (1991).  The Supreme Court remanded the case back to the state court, noting that the notice-and-hearing requirement at issue "serves legitimate state interests in protecting against surprise, harassment, and undue delay," and that failure to comply with the requirement "may in some cases justify even the severe sanction of preclusion."  *Id.* at 152-53. The Court "express[ed] no opinion as to whether or not preclusion was justified" under the facts of that case, 500 U.S. at 153, and left it to the state court to initially decide that question.

things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant,'" must be done within reason.  *Fowler v. Sacramento Cnty. Sheriff's Dep't*, 421 F.3d 1027, 1037 (9th Cir. 2005) (quoting *Van Arsdall*, 475 U.S. at 679 ("reasonable limits" may be imposed); *see Olden v. Kentucky*, 488 U.S. 227, 232 (1988) (trial court may impose reasonable limits, but the "limitation here was beyond reason.  Speculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of [complainant's] testimony").[4]  When the California Court of Appeal determined that, because there was no abuse of discretion in excluding the evidence, there "necessarily" was no Confrontation Clause violation, that court failed to recognize or apply this second aspect of the Confrontation Clause analysis.  The California Court of Appeal's decision used the wrong test and therefore was contrary to clearly established law from the Supreme Court.

The case of *Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013), does not show the absence of clearly established law from the Supreme Court on point.  There, the Supreme Court observed that it had "never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes."  *Nevada v. Jackson*, 133 S. Ct. at 1994 (criticizing Ninth Circuit for "elid[ing] the distinction between cross-examination and extrinsic evidence by characterizing the cases as recognizing a broad right to present 'evidence bearing on [a witness'] credibility'") (second alteration in original).  In *Nevada v. Jackson*, the defense was precluded from introducing testimony and police reports showing that the rape victim previously reported that the defendant had assaulted her, that the police had been unable to substantiate those allegations, and that the police were skeptical of several of those earlier reports.  "Although the trial court gave the

---

[4] In *Olden*, 488 U.S. 227, the Supreme Court held that a trial court's refusal to permit a rape defendant to cross-examine the complainant about her cohabitation with a boyfriend violated the defendant's Sixth Amendment rights.  The defendant claimed he had consensual sex with the complainant and that she had made up the rape story to avoid disrupting her relationship with her boyfriend after she was seen getting out of a car in which the defendant was present.  The trial court had determined the evidence was relevant, but excluded it under a section 352-type analysis because its probative value was outweighed (in the trial court's view) by its possibility for prejudice in that showing that the white complainant lived with an African American man might "have created extreme prejudice" in the jurors' minds against the white complainant.  *Id.* at 230-31. The trial court's prohibition on cross-examination on the topic "was beyond reason."  *Id.* at 232.

United States District Court
Northern District of California

defense wide latitude to cross-examine [the rape victim] about those prior incidents, it refused to admit the police reports or to allow the defense to call as witnesses the officers involved." *Id.* at 1991.  Unlike in *Nevada v. Jackson*, the trial court here did not allow the defense to cross-examine Jane Doe about her 2004-2006 prostitution activities and convictions.  The present case is not about limitations on only extrinsic evidence and instead includes preclusion of all cross-examination on the topic.  Because Jane Doe's prostitution activities occurring more than two years after the reported rape were off limits entirely, this case does not run into the problem identified in *Nevada v. Jackson*, i.e., the absence of clearly established Supreme Court precedent on the right to present extrinsic evidence for impeachment purposes.  Gardner's Confrontation Clause claim can be and is considered only in terms of the prohibition on cross-examination of Jane Doe about her prostitution activities and convictions.  She had already testified about those activities at Gardner's preliminary hearing and the first trial.

Having determined that the state appellate court's decision was contrary to clearly established federal law from the Supreme Court, the federal court does not automatically grant habeas relief; rather, the federal court must do a de novo review of the constitutional issue raised. *Frantz v. Hazey*, 533 F.3d at 735.  This court now turns to that task.

3.      A Confrontation Clause Violation Occurred

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.*

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to

impeach, i.e., discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony."

*Davis v. Alaska*, 415 U.S. 308, 316–17 (1974) (quoting *Greene v. McElroy*, 360 U.S. 474 (1959).

"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Van Arsdall*, 475 U.S. at 680 (quoting *Davis*, 415 U.S. at 318) (omission in original). It is not necessary that the cross-examination would have been certain to affect the jury's assessment of the witness' reliability or credibility; rather, "it is sufficient that a jury 'might reasonably' have questioned the witness's reliability or credibility in light of the cross-examination." *Fowler*, 421 F.3d at 1036 (citing *Van Arsdall*, 475 U.S. at 680, *Davis*, 415 U.S. at 319, and *Olden*, 485 U.S. at 232).

The right to cross-examine is not limitless. *Fowler*, 421 F.3d at 1036. Trial judges "retain wide latitude" to "impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. "Rather significantly, however, these restrictions must be 'reasonable,' and 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *Fowler*, 421 F.3d at 1037 (quoting *Van Arsdall*, 475 U.S. at 679, and *Lucas*, 500 U.S. at 151).

Gardner's Sixth Amendment right to be confronted with the witness against him was violated because a reasonable jury might have received a "significantly different impression," *Davis*, 415 U.S. at 318, of Jane Doe's credibility if defense counsel had been permitted to confront Jane Doe with her prostitution convictions. Had defense counsel been permitted to ask Jane Doe

about her criminal record, the jury would have been able to use the criminal conduct to evaluate Jane Doe's testimony.  The jury likely would have been instructed that "[t]he fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility.  It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."  CALCRIM No. 316.  The jury might have found her less credible (or not credible at all), based on the fact that she had been convicted many times of crimes of moral turpitude.  If the jury learned that Jane Doe had been convicted six times for prostitution, the jury might have found her denial of being a prostitute on the night of the reported rape to be unconvincing and then rejected many other parts of her testimony.  If the jury also learned that Jane Doe had been arrested for prostitution in 2005 in the same general area as the reported rape in 2002, the jury might have found her denial of being a prostitute on the night of the reported rape to be unconvincing and then rejected many other parts of her testimony.  Her testimony had some details that appeared somewhat inconsistent with being a prostitute, e.g., that she was only in the rough neighborhood to meet some friends to go to a movie elsewhere in town, that she was on the phone to get a ride home after failing to connect with her friends, and that she did not attempt to flee or ask for help when she was with Gardner on a municipal bus or when she was separated from Gardner in a liquor store.  Once Jane Doe's credibility was impeached with her prostitution record, the jury might have chosen to believe Gardner over Jane Doe, as his version was that she was a prostitute and her motivation to accuse him of rape was to get even because he had refused to pay for services rendered.  The importance of the prostitution evidence was not to show that she consented or deserved to be sexually assaulted for the very reason that she was a prostitute; rather, it would have been to make her testimony as to what occurred that night less believable.

The prostitution evidence was relevant, as the state courts found.  Although viewing the evidence as "not 'particularly strong on the issue of [Jane Doe's] honesty or veracity today,'" the trial court excluded it under California Evidence Code section 352, and that necessarily includes a determination that the evidence is relevant.  *See Fowler*, 421 F.3d at 1039 n.8.  The California Court of Appeal described "the evidence that Jane Doe was arrested in 2005 several blocks from where she encountered defendant in 2002" as "certainly relevant on the issue of her credibility."

Cal. Ct. App. Opinion at 15.

The countervailing policy concern articulated by the state court for excluding the evidence was that the jury might consider it for an improper purpose.  That concern about issue confusion was not sufficient to completely exclude the prostitution evidence, especially when the jury could have been given limiting instructions about the use of the evidence.  The evidence was not so complex that its proper use was beyond the grasp of a properly instructed jury.  *Cf. Fowler*, 421 F.3d at 1040 (since federal and state evidence rules allow jurors to consider prior bad acts of defendants as propensity evidence, jurors should be competent to understand the proffered cross-examination on the witness' prior accusations against other men).  If the evidence of Jane Doe's prostitution was thought so likely to be used for an improper purpose that improper use could not be avoided with pointed jury instructions, the trial court could have at least allowed cross-examination about her convictions with the crime being labelled "a crime of moral turpitude" rather than "prostitution."  Asking her whether she had been convicted on six occasions of a crime of moral turpitude might not have been ideal, but it would have allowed some evidence on a matter that might lead jurors to doubt her credibility rather than to completely foreclose inquiry on the topic.  The precluded cross-examination sufficiently bore on Jane Doe's credibility such that a jury might reasonably have questioned her credibility upon hearing it.  The trial court's concerns about potential misuse of the evidence were not "sufficiently well-founded to justify precluding rather than limiting the cross-examination."  *Fowler*, 421 F.3d at 1041.  *See, e.g., Holley v. Yarborough*, 568 F.3d 1091, 1098-99 (9th Cir. 2009) (state court's exclusion of evidence that the child-victim of a reported rape had a highly active sexual imagination and was familiar with sexual activities was unreasonable and disproportionate to the purpose of the rule allowing limitations on cross-examination based on concerns about harassment, prejudice, and issue-confusion); *Slovik v. Yates*, 556 F.3d 747, 753 (9th Cir. 2009) (Confrontation Clause violation occurred when defense was not allowed to ask witness about being on probation; evidence was not being proffered to establish that the witness was unreliable simply because he was on probation, but rather to establish that he was unreliable because he lied about being on probation and to establish he had an ulterior motive to place the blame on defendant, i.e., to avoid admitting

violation of his own probation).  Gardner's Sixth Amendment right to confront the witness was violated.

### 4.   The Error Warrants Relief Because It Was Not Harmless

The Confrontation Clause error will warrant habeas relief only if the error was not harmless.  The "inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized," the error was harmless.  *Van Arsdall*, 475 U.S. at 684.  As this is a federal habeas proceeding, the error is harmless unless it had "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  Relevant factors to consider include the importance of the witness' testimony, whether the excluded testimony was cumulative, the presence of evidence corroborating or contradicting the testimony on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case.  *Van Arsdall*, 475 U.S. at 684; *Fowler*, 421 F.3d at 1041-42.

Jane Doe was the complainant and was an indispensable witness.  Without her testimony, there would not have been a trial.  The evidence about her prostitution convictions was not cumulative of any other evidence at trial.  There was some evidence corroborating her testimony on some material points (e.g., the DNA evidence and Gardner's testimony corroborated that Jane Doe and Gardner had a sexual encounter at the reported location), but on the focal question of whether it was rape or consensual sex, there was only the rape exam evidence and that was not definitive.  Cross-examination of Jane Doe was not otherwise limited.  The prosecution's case was not weak, but was certainly not overwhelming – and it rested very heavily on Jane Doe's testimony.

This case was largely a credibility contest between Jane Doe and Gardner.  Without the prostitution-conviction evidence, there was little reason to discount her testimony, other than a few inconsistencies -- mostly in her description of the sex acts -- that the prosecutor shrugged off as owing to the passage of ten years between crime and trial.  No lay witnesses corroborated the testimony of Jane Doe or Gardner.   The rape exam evidence was open to conflicting interpretations.  The rape exam done at the hospital hours after she reported the rape showed some

United States District Court
Northern District of California

United States District Court
Northern District of California

1   injury to Jane Doe's genital area.  RT 494.  The physician's assistant who examined Jane Doe

2   believed that it was more likely injuries would be found after nonconsensual intercourse, but

3   acknowledged that "there is no way to say whether this injury . . . can only be from sexual assault

4   versus consensual intercourse."  RT 475, 491.  On the other hand, the defense expert said that the

5   results of the rape exam did not show any evidence of sexual assault, and that it was impossible to

6   discern from the photos whether the signs of possible abrasion or rubbing resulted from

7   consensual sex, nonconsensual sex, or something other than sexual contact.  RT 579, 583, 585.

8   The other physical evidence was limited.  A police officer had noticed an "area of minor swelling"

9   on Jane Doe's face, RT 303, but the physician's assistant conducting the rape exam did not note

10  any bruising or swelling on Jane Doe's face, RT 492.  A photo taken the night of the reported rape

11  was unhelpful because Jane Doe's hair covered the eye she stated had been hit by Gardner.  RT

12  226.

13          The fact that the success of the prosecution hinged on the jury believing Jane Doe's

14  testimony, "strongly supports a finding that the error was not harmless" when the defense was not

15  allowed to cross-examine her to impeach her credibility with the prostitution evidence.  *Fowler*,

16  421 F.3d at 1042 (collecting cases).  Without the prostitution evidence being brought forth on

17  cross-examination, the jury was left without a possible explanation for why Jane Doe might have a

18  motive to falsely accuse Gardner of rape.  And without the prostitution evidence being brought

19  forth on cross-examination, the jury was left with little basis on which to doubt Jane Doe's

20  veracity generally.  With so little clear evidence as to whether it was rape or a dispute arising from

21  nonpayment for a prostitute, other than the sharply opposing testimony of the complaining witness

22  and defendant, the refusal to allow cross-examination of the complaining witness about her

23  prostitution activities and convictions had a substantial and injurious effect in determining the

24  jury's verdict.  Gardner is entitled to the writ on this claim.

25

26

27

28

B.      Ineffective Assistance of Counsel Claim

1.      Background

Gardner claims that his attorney provided ineffective assistance when he failed to object to misconduct committed by the prosecutor during his rebuttal closing argument.  Gardner asserts that the prosecutor misrepresented critical evidence, and that defense counsel's failure to object to that misrepresentation deprived him of the effective assistance of counsel.

Both parties put forth expert medical testimony at trial to shed light on the possible causes of Jane Doe's injuries.  Martin Moran, a physician's assistant who was part of the hospital's sexual assault response team, examined Jane Doe hours after the reported rape.  *See* Cal. Ct. App. Opinion at 17.  Moran testified that there was injury to Jane Doe's posterior fourchette, an area commonly injured during sexual assault.  *See id.*  Moran further testified that although injury to the posterior fourchette is statistically more common in sexual assault than consensual sexual intercourse, it could not be determined with scientific certainty whether the injury was the result of sexual assault or consensual intercourse.  *See id.*  Gardner's expert witness, a medical doctor, had not examined Jane Doe but testified that he could not tell from the photographs of the examination whether the injury was caused by consensual or nonconsensual sexual contact.  *See id.*

During his rebuttal closing argument, the prosecutor argued to the jury that, "[i]f there was consensual sex, we wouldn't expect to see injuries, but there just happens to be injuries that corroborate her story."  RT 699.  Gardner claims that this statement should have been objected to by counsel because it misrepresented critical evidence.

The California Court of Appeal rejected Gardner's claim:

> The prosecutor's remarks were fair comment on the evidence.  Moran testified that such injuries were "much more likely" to result from a sexual assault, but acknowledged that whether the injuries resulted from consensual or nonconsensual sexual activity could not be determined "conclusively" or to a "scientific certainty."  "A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence."  (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.)  Based on Moran's testimony, the prosecutor could properly argue the inference that the injuries corroborated Jane Doe's account.

Cal. Ct. App. Opinion at 18 (footnote omitted).  The state appellate court found "no prosecutorial misconduct, and therefore no ineffective assistance."  *Id.* at 17.

2.     Analysis

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must establish two things. First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). The "question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

The California Court of Appeal's rejection of the ineffective assistance of counsel argument was not an unreasonable application of clearly established Supreme Court precedent. The California Court of Appeal reasonably determined that counsel's performance did not fall below an objective standard of reasonableness because the prosecutor's remark during his rebuttal closing was a fair comment on the evidence. "Prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).

Gardner contends the prosecutor made a "crucial misrepresentation of critical evidence" because the medical experts testified that they were not able to determine with scientific certainty whether the injury to Jane Doe's posterior fourchette was caused by sexual assault or consensual sex. Petition at 47. However, the prosecution's medical expert had opined that, statistically

speaking, the type of injury seen was more commonly a result of sexual assault.  This evidence provided a sufficient basis for the prosecutor to argue the reasonable inference that injuries had been found that corroborated Jane Doe's account of the events.  Because the prosecutor's comment was a fair comment on the evidence, the state appellate court reasonably could conclude that the defense attorney did not engage in deficient performance by not objecting to the evidence.  A lawyer need not file a motion or make an objection that he knows to be meritless on the facts and the law.  *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) ("to show prejudice under *Strickland* from failure to file a motion, [a petitioner] must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him"); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take futile action can never be deficient performance).

Additionally, because the challenged remark was a fair comment on the evidence (as the California Court of Appeal determined), the California Court of Appeal also reasonably could determine that any objection to it would not have been sustained, so there was no reasonable probability that the result of the proceeding would have been different.

Applying the "'highly deferential' look at counsel's performance," through § 2254(d)'s already "'deferential lens,'" *Cullen v. Pinholster*, 563 U.S. at 190, it cannot be said that the California Court of Appeal's rejection of Gardner's ineffective assistance of counsel claim was contrary to or an unreasonable application of *Strickland*.  The state appellate court's analysis presents a "reasonable argument that counsel satisfied *Strickland's* deferential standard," and that is sufficient to bar relief under § 2254(d).  *See Harrington v. Richter*, 562 U.S. at 105.  Gardner is not entitled to the writ on this claim.

C.     Cumulative Error Claim

Gardner contends that the cumulative effect of several errors warrants reversal.  In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be

United States District Court
Northern District of California

1   overturned. *See Alcala v. Woodford,* 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing conviction

2   where multiple constitutional errors hindered defendant's efforts to challenge every important

3   element of proof offered by prosecution).  "[T]he fundamental question in determining whether

4   the combined effect of trial errors violated a defendant's due process rights is whether the errors

5   rendered the criminal defense 'far less persuasive,' *Chambers* [*v. Mississippi,* 410 U.S. 284, 294

6   (1973)], and thereby had a 'substantial and injurious effect or influence' on the jury's verdict,

7   *Brecht,* 507 U.S. at 637."  *Parle v. Runnels,* 505 F.3d 922, 928 (9th Cir. 2007).  Here, there were

8   not multiple trial errors to accumulate.  Gardner therefore is not entitled to relief under the

9   cumulative error doctrine.

11   D.     Certificate of Appealability

12       Respondent does not need a certificate of appealability to appeal the order insofar as it

13   grants relief on the Confrontation Clause claim. However, if respondent takes an appeal on that

14   claim, Gardner would need a certificate of appealability if Gardner wanted to cross-appeal on the

15   two claims as to which relief was denied.  *See Rios v. Garcia*, 390 F.3d 1082, 1087-88 (9th Cir.

16   2004).

17       A certificate of appealability will not issue on the claims of ineffective assistance of

18   counsel and cumulative error.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable

19   jurists would find the district court's assessment of [those] constitutional claims debatable or

20   wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability

21   is DENIED on the claims of ineffective assistance of counsel and cumulative error.

## CONCLUSION

24       For the foregoing reasons, the petition for writ of habeas corpus is GRANTED because

25   Gardner's rights under the Confrontation Clause were violated at his trial.  Respondent shall

26   release Gardner unless the State of California commences proceedings to retry him within **ninety**

27   **days** of the date of this order.

28       Gardner's motion to file a long traverse is GRANTED.  (Docket No. 21.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

    The clerk shall send a copy of this order to the Alameda County Public Defender's Office at Suite 400, 1401 Lakeside Drive, Oakland, CA 94612.  The court requests that the Alameda County Public Defender obtain representation for Gardner if he meets the eligibility requirements.

    **IT IS SO ORDERED**.

Dated:   October 28, 2016

_____
SUSAN ILLSTON
United States District Judge